The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before then Deputy Commissioner Ballance and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. At the time this claim arose, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The employer-employee relationship existed between defendant-employer and plaintiff on the date of the admittedly compensable occupational disease giving rise to plaintiff's claim herein.
3. The carrier on the risk at all times relevant was Liberty Mutual Insurance Company.
4. The plaintiff and defendants stipulated into evidence the exhibits including all the medical and treatment notes, letters and status reports from William Pekman, M.D., E. Brown Crosby, M.D., and records from American Rehabilitation, Inc.
5. Plaintiff's average weekly wage shall be calculated pursuant to a Form 22 wage chart.
6. Defendants admitted that plaintiff suffered carpal tunnel syndrome, which was significantly contributed to by his work at Hickory Springs (defendant-employer); that the causation of plaintiff's carpal tunnel syndrome is not an issue and that the issue is the degree of disability resulting from the carpal tunnel syndrome.
***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. Plaintiff was forty-five years old at the time of the hearing and had completed the twelfth grade of high school. Plaintiff was hired on 20 January 1992 as a machine operator/assembly line worker with Hickory Springs Metal Plant in Hickory, North Carolina. Plaintiff's previous employment positions include an assembler, machine operator, and spray operator.
2. During his employment with Hickory Springs, plaintiff assembled reclining mechanisms which fit into chairs. This procedure entailed being handed a reclining mechanism from the person next to him on the assembly line which plaintiff then grabbed with both hands and placed onto a rivet machine. Plaintiff sometimes had to flip the mechanism with a forward, twisting motion in order to properly situate the mechanism on the rivet machine. The reclining mechanism that plaintiff handled weighed about ten pounds and was six to eight inches in length and height. While supporting the reclining mechanism with his left hand, plaintiff picked up an additional part and placed that part into the reclining mechanism. He then put three rivets and washers into the part which were secured by pushing a foot pedal that activated the machine to come down and lock the rivets into place. Finally, plaintiff picked up the entire mechanism off the rivet machine and slid it down the table on to the next person on the assembly line. This entire procedure took less than one minute.
3. During July, 1992, plaintiff began to experience numbness in his thumb and index finger on both hands while working on the assembly line. About twenty people worked in plaintiff's department doing the same job as plaintiff and from time to time plaintiff noticed that a few of his co-workers wore wrist splints while working. Plaintiff reported his medical condition to John Holland, his supervisor, who sent plaintiff to talk with Steve Migielicz, the safety coordinator. Mr. Migielicz referred plaintiff to Dr. William Pekman, an orthopedic surgeon.
4. Plaintiff's first visit with Dr. Pekman was 28 July 1992 at which time plaintiff reported symptoms of numbness and tingling in his hands which had been present for approximately three weeks prior. Plaintiff stated to Dr. Pekman that these symptoms had appeared over a course of time as opposed to arising due to any singular event. Plaintiff also presented a medical history of adult onset diabetes and that his hands bothered him at night. Dr. Pekman examined plaintiff and ordered nerve conduction studies which were performed by Dr. Stutesman. Dr. Pekman's diagnosis and the study results revealed that plaintiff suffered from bilateral carpal tunnel syndrome, mild bilateral ulnar entrapment at the elbow, and early mixed peripheral motor and sensory neuropathy.
5. Plaintiff's bilateral carpal tunnel syndrome is an occupational disease which is due to causes and conditions which are characteristic of and peculiar to plaintiff's employment with defendant-employer and was not caused by diabetes. Plaintiff's employment placed him at an increased risk of developing carpal tunnel syndrome as compared to the public in general.
6. Dr. Pekman performed left carpal tunnel release surgery on plaintiff on 13 August 1992 and right carpal tunnel release surgery on 24 September 1992. After the first surgery, plaintiff returned to work on the next day with instructions to wear a splint on his left hand and to do light duty work only and to limit repetitive hand activity. After the second surgery, plaintiff also returned to work the next day, again with restrictions pertaining to excessive lifting and repetitive motions. Plaintiff subsequently had office visits with Dr. Pekman in October and November of 1992 and in January and March of 1993.
7. Following his surgery, plaintiff had been assigned various light duty jobs which he performed. Plaintiff was restricted to work involving no repetitive use of the hands and work that would not involve trauma to the palms of his hands. On 15 December 1992, plaintiff was assigned work under the supervision of William Hill wherein plaintiff was responsible for supplying parts to nine or ten machine operators located at different work stations. The job required plaintiff to pick up machine parts out of a bin, stack the parts on the side of the bin, then grab a handful of the parts which had a total weight of between ten to fifteen pounds, and carry these parts approximately three feet to each operator's station. It was necessary for plaintiff to take a handful of parts to the operators because supplying only one or two parts at a time would interrupt the flow of production and possibly even halt the assembly line. While performing this job, plaintiff experienced aching and tingling in his hands, and he reported this to Mr. Hill, explaining that he could not perform this job because it was causing his hands to hurt. The next day after experiencing pain in both hands during the night, plaintiff requested that Mr. Hill place him on a different task, but Mr. Hill responded that the parts job is where he needed plaintiff to work. Plaintiff's testimony is corroborated by Ms. Peggy Keaton, a co-worker. Plaintiff then left the manufacturing facility and was subsequently terminated.
8. Plaintiff applied for services with Vocational Rehabilitation, an agency of the North Carolina Department of Human Resources on 21 December 1992 but was unable to find suitable employment. Plaintiff also applied for and received unemployment benefits beginning 27 December 1992 and continuing for twenty four weeks at the rate of $104.00 per week. In September of 1993, defendants assigned a vocational coordinator from American Rehabilitation, Inc. to work with plaintiff in obtaining employment. As of October, 1993, plaintiff had not been successful in securing employment, and defendants withdrew the vocational coordinator.
9. On 7 December 1993, plaintiff finally secured full-time employment with Regency Bedspread at the rate of $6.00 per hour.
10. As of 8 March 1993, Dr. Pekman concluded that plaintiff had reached maximum medical improvement, and he assigned a five percent (5%) permanent partial disability rating to each of plaintiff's hands. Dr. Pekman also recommended that plaintiff avoid repetitive motions or recurrent palmar trauma. A second electrodiagnostic test was ordered by Dr. Pekman and performed by Dr. Stutesman on 10 November 1993 because plaintiff continued having symptoms and had had difficulty working. The findings of this second study revealed definite interval improvement in plaintiff's compressive neuropathy but did not address whether plaintiff still had a diabetic neuropathy.
11. Plaintiff sought a second opinion on the extent of his permanent partial impairment from Dr. E. Brown Crosby. His evaluation with Dr. Crosby was on 23 September 1993. Plaintiff reported having radiating pain as much as three times per week, burning over the thumb, index, long and part of the ring finger on both hands, the left hand being worse. Plaintiff also experienced difficulty lifting objects weighing twenty-five pounds or more. Dr. Crosby's examination of plaintiff revealed no wasting or atrophy of the muscles in the thumb area of the thenar muscles, full motion throughout the small joints of all the digits, some tenderness at his surgical incisions, and some very mild signs of residual carpal tunnel type problems. Dr. Crosby diagnosed plaintiff with bilateral post carpal tunnel releases.
12. Dr. Crosby recommended that plaintiff not engage in employment requiring him to lift above twenty pounds, even on an occasional basis, since plaintiff was vulnerable to recurrent carpal tunnel syndrome in both of his hands. Dr. Crosby ultimately gave plaintiff a permanent partial disability rating of ten percent (10%) of the left hand and seven and one-half percent (7 1/2%) of the right hand. Even though Dr. Crosby acknowledged that diabetes could, with peripheral neuropathy, render the carpal tunnel more vulnerable to injury, he based plaintiff's disability rating on the work related problems. Dr. Crosby did not outline further medical treatment for plaintiff, but recognized that a patient who has surgery for carpal tunnel syndrome will have weakness and problems with their hands for quite some time, possibly as long as one or two years. Therefore plaintiff could potentially require ongoing supportive medical care, such as splinting and therapy.
13. Plaintiff has contracted a compensable occupational disease as a result of his employment at Hickory Springs. Plaintiff's symptoms after 8 March 1993 were caused by his compensable occupational disease, not his pre-existing diabetes.
14. Plaintiff's conduct in leaving the job assigned to him on 15 December 1992 after his immediate supervisor refused to give him more suitable work did constitute an unjustified refusal of suitable employment in that plaintiff made no effort to seek another job assignment through his primary supervisor, John Holland or through Steve Migielicz, the safety coordinator, both of whom had instructed plaintiff to report any problems relating to his job duties and medical restrictions.
15. Plaintiff reached maximum medical improvement on 8 March 1993.
16. Plaintiff's average weekly wage at the time of injury was $245.91, yielding a compensation rate of $163.94 per week.
***********
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. Plaintiff has contracted an admittedly compensable occupational disease of bilateral carpal tunnel syndrome. Plaintiff's bilateral carpal tunnel syndrome resulted from causes and conditions which are characteristic of and peculiar to plaintiff's particular job, occupation or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment. N.C. Gen. Stat. 97-53 (13).
2. As a result of his compensable occupational disease, plaintiff was temporarily totally disabled for less than seven (7) days and is not entitled to any temporary total disability compensation. N.C. Gen. Stat. 97-28.
3. Because plaintiff refused work offered by defendants without justification and failed to follow the proper procedure before walking off the job on December 15, 1992, he is not entitled to receive temporary total disability compensation at any time during the continuance of such refusal. N.C. Gen. Stat. § 97-29, N.C. Gen. Stat. § 97-32.
4. As a result of his compensable occupational disease, bilateral carpal tunnel syndrome, plaintiff has sustained a permanent partial impairment of eight percent (8%) to his left hand and a permanent partial impairment of six percent (6%) to his right hand. Plaintiff is entitled to compensation from defendants for said permanent partial disability.
5. Plaintiff is entitled to payment by defendant of all medical expenses arising from his compensable injury including future medical expenses. N.C. Gen. Stat. § 97-25.
***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Subject to counsel's fee, defendants shall pay to plaintiff in one lump sum permanent partial disability benefits at the rate of $163.94 per week for 16 weeks for the eight percent (8%) permanent partial impairment to plaintiff's left hand and permanent partial disability compensation at the rate of $163.94 per week for 12 weeks for the six percent (6%) permanent partial impairment to his right hand.
2. Defendants shall pay expenses for medical treatment incurred or to be incurred as a result of plaintiff's compensable occupational disease when bills for same have been submitted pursuant to the approved Industrial Commission procedure for so long as such treatments are reasonably required to give relief, effect a cure or lessen plaintiff's period of disability.
3. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded plaintiff herein shall be deducted and paid directly to plaintiff's counsel.
4. Defendants shall pay the costs for the hearing before the Deputy Commissioner. Each side shall bear its own costs for the Full Commission hearing.
 S/ _________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/ _________________ DIANNE C. SELLERS COMMISSIONER
S/ _________________ SCOTT M. TAYLOR DEPUTY COMMISSIONER